MORRISON & FOERSTER LLP
Michael A. Jacobs (pro hac vice motion forthcoming)
Roman Swoopes (pro hac vice motion forthcoming)
425 Market Street
San Francisco, California  94105-2482
415.268.7000

MORRISON & FOERSTER LLP
J. Alexander Lawrence
250 West 55th Street
New York, New York 10019-9601
212.468.8000

Paul Goldstein (pro hac vice motion forthcoming)
559 Nathan Abbott Way
Stanford, California 94305-8610
650.723.0313

EASTMAN & EASTMAN
John L. Eastman (pro hac vice motion forthcoming)
Lee V. Eastman (pro hac vice motion forthcoming)
39 West 54th St
New York, New York 10019
212.246.5757

Attorneys for Plaintiff
James Paul McCartney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

JAMES PAUL MCCARTNEY, an individual,

     Plaintiff,

-v.-

SONY/ATV MUSIC PUBLISHING LLC, a Delaware Limited Liability Company, and SONY/ATV TUNES LLC, a Delaware Limited Liability Company,

     Defendants.

---------------------------------------------------------------x

Case No.   17cv363

**Complaint for Declaratory Judgment**

**Demand for Jury Trial**

## COMPLAINT FOR DECLARATORY JUDGMENT

  Plaintiff James Paul McCartney, for his complaint against Sony/ATV Music Publishing LLC and Sony/ATV Tunes LLC, alleges as follows:

## NATURE OF THIS ACTION

1. This action involves ownership interests in the copyrights for certain musical works that Plaintiff Sir James Paul McCartney (known professionally as Paul McCartney) authored or co-authored with other former members of the world-famous musical group The Beatles. Defendants in this action are music publishing companies that claim to be the successors to publishers that acquired copyright interests in many of Paul McCartney's compositions in the 1960s and early 1970s. Starting in October 2008 and pursuant to 17 U.S.C. § 304(c), Paul McCartney has served on Defendants and on others termination notices to reclaim his copyright interests in his musical compositions. The notices served on Defendants and recorded in the U.S. Copyright Office have effective dates starting October 5, 2018. In this action, Paul McCartney seeks a declaration that the Termination Notices served on Defendants are valid, that the Termination Notices will re-vest Paul McCartney's copyright ownership in him on their effective termination dates, and that the Termination Notices do not give rise to any valid contract claim against Paul McCartney.

## PARTIES

2. Plaintiff Paul McCartney is a singer-songwriter, multi-instrumentalist, and composer. Paul McCartney was a founding member of The Beatles, perhaps the most famous musical group of all time. With The Beatles, he performed and collaborated with John Lennon, George Harrison, and Ringo Starr. Paul McCartney is a citizen of the United Kingdom.

3. Defendant Sony/ATV Music Publishing LLC is a Delaware limited liability company with a principal place of business in New York.

4. Defendant Sony/ATV Tunes LLC is a Delaware limited liability company with a place of business in New York. Sony/ATV Tunes LLC is a partially owned subsidiary of Sony/ATV Music Publishing LLC.

## JURISDICTION

5. This is a declaratory judgment action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court has jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 (federal question) and 1338(a) (copyright) because all of Paul McCartney's claims depend on resolution of a substantial question of federal copyright law and because a distinctive policy of the Copyright Act requires that the federal principles control the disposition of the claims.  This Court also has jurisdiction over Paul McCartney's claims for declaratory judgment of no breach of contract on the alternative basis of diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiff Paul McCartney is a citizen of the United Kingdom, and no Defendant is a citizen of a foreign state.  Moreover, the copyright interests at issue in this case are worth well in excess of $75,000.

6. This Court has personal jurisdiction over Sony/ATV Music Publishing LLC and Sony/ATV Tunes LLC because both Defendants have places of business in this district.

### VENUE

7. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(a) because both Defendants reside in this district and a substantial part of the events giving rise to the claim occurred in this district.

### COPYRIGHT ACT BACKGROUND

8. The musical works at issue in this litigation were composed during the 1960s and early 1970s.  The 1909 U.S. Copyright Act was in effect during that period.

9. The 1909 Copyright Act entitled authors to an initial 28-year copyright term, which they could then renew for an additional 28 years.  *See* Copyright Act of 1909, Section 23.  Congress revised the Copyright Act in 1976.  Among other provisions, the 1976 Act extended the copyright term for works created before January 1, 1978 by 19 years, for a total of 75 years from the date the copyright was originally secured.  The Copyright Term Extension Act of 1998 further extended the copyright term by another 20 years, for a total of 95 years from the date the copyright was originally secured.  *See* 17 U.S.C. § 304(b).

10. Section 304(c) of the 1976 Copyright Act gives authors like Paul McCartney who, before January 1, 1978, assigned or otherwise transferred their copyright interests to third parties, the non-waivable right to terminate those transfers and reclaim their copyright interests.

3

Congress adopted the termination of transfer provisions to ensure that the extended copyright term would benefit authors and their heirs and would not be a windfall to grantees who negotiated transfers before the extended copyright term existed. As stated in the 1976 Act House Report: "[T]he extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it." H.R. Rep. No. 94–1476, at 140 (1976).

11. Specifically, Section 304(c) provides that in the case of any copyright in its first or renewal term on January 1, 1978, any transfer or license covering the renewal term executed before January 1, 1978 by the author or his statutory successors is subject to termination "at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." 17 U.S.C. § 304(c)(3).

12. Significantly, "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." *Id.* § 304(c)(5). As the Second Circuit has explained, "the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002).

13. To terminate a transfer or license to a grantee, an author must serve advance notice on the grantee and otherwise comply with the provisions of 17 U.S.C. § 304(c)(4).

## FACTUAL BACKGROUND

*The Creation of the Works at Issue and the Assignment to Sony/ATV*

14. Paul McCartney and John Lennon jointly composed the bulk of The Beatles' songs between approximately September 1962 and approximately June 1971, the period of musical authorship relevant to this complaint.

15. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "The authors of a joint work are co-owners of copyright in the work." 17 U.S.C. § 201(a). This means that for each joint work created by Paul McCartney and John Lennon, each

4

author initially held a one-half, undivided interest that the authors could assign to third parties. In some instances, Paul McCartney would also write musical works individually, and he would initially own all rights to such works.[1]

16.    Between 1962 and 1971, Paul McCartney and John Lennon typically assigned the copyright interests in their musical works to publishers in exchange for royalties.

17.    In 1962, The Beatles released their first singles, "Love Me Do" and "P.S. I Love You," both of which were written by Paul McCartney and John Lennon. A company called Ardmore & Beechwood, Ltd. ("Beechwood") published these two compositions pursuant to an agreement with Paul McCartney and John Lennon dated September 7, 1962 ("the 1962 Publishing Agreement"). Pursuant to the 1962 Publishing Agreement and in exchange for royalties, Paul McCartney and John Lennon assigned to Beechwood the copyrights for the compositions "Love Me Do" and "P.S. I Love You" "in all Countries for the period of copyright as far as it is assignable by law."

18.    A different company, Northern Songs Limited, served as the publisher for the majority of the compositions that Paul McCartney and John Lennon wrote and thus was the assignee for most of their copyright interests from 1963 to 1971. Northern Songs was established in January 1963, and Paul McCartney and John Lennon each owned approximately 20% of the company. The remaining 60% of Northern Songs was owned by a combination consisting of a company called Dick James Music and another company called Nems Enterprises Limited ("Nems"). Brian Epstein, who managed the careers of John Lennon and Paul McCartney at the time, controlled Nems.

19.    For example, the song "Can't Buy Me Love," jointly authored by Paul McCartney and John Lennon, released in March 1964, and registered with the U.S. Copyright Office under registration number EF 28945, was one of several musical works assigned to Northern Songs pursuant to an August 14, 1963 publishing agreement ("the 1963 Publishing Agreement").

---

[1] Paul McCartney also jointly authored a handful of musical works that are the subject of this lawsuit with George Harrison and/or Ringo Starr, the other members of The Beatles.

5

Under the terms of the 1963 Publishing Agreement, Paul McCartney and John Lennon would compose at least 18 musical works over a three-year term and assign the copyrights for those works to Northern Songs in exchange for royalties. The assignment was for "all countries of the World for the period of the copyrights as far as it is assignable by law."

20. On May 12, 1964, Paul McCartney and John Lennon incorporated a company known as Lenmac Enterprises Limited ("Lenmac") to serve as their alter ego and help them manage their copyright interests. Paul McCartney and John Lennon each owned 40% of Lenmac's stock, and Nems owned the remaining 20%. In 1964, Paul McCartney and John Lennon signed agreements assigning to Lenmac the fees and royalties that Paul McCartney and John Lennon would receive pursuant to their agreement with Northern Songs, effective June 1, 1964. Instead of paying royalties directly to Paul McCartney and John Lennon pursuant to the 1963 Publishing Agreement, Northern Songs paid royalties to Lenmac, which, in turn, distributed the royalties to Paul McCartney and John Lennon. As described below, another company subsequently took Lenmac's place, and Lenmac's shares were eventually sold to Northern Songs.

21. On February 5, 1965, Paul McCartney and John Lennon incorporated another company known as MacLen (Music) Limited ("MacLen"). Paul McCartney and John Lennon each owned 40% of MacLen's stock, and Nems owned the remaining 20%.

22. On February 11, 1965, Paul McCartney and John Lennon executed an agreement between themselves, MacLen, and Nems, under which Paul McCartney and John Lennon assigned the copyrights in the musical works they would create over the next eight years to MacLen (the "MacLen Agreement"). Specifically, the language of the MacLen Agreement assigns to MacLen the "full copyright for all countries of the world" in the compositions subject to the agreement. The MacLen Agreement further recites that Paul McCartney and John Lennon were assigning the relevant copyright interests "so far as such copyright or right is assignable by law." Because Paul McCartney and John Lennon together owned 80% of MacLen's stock, they

6

effectively controlled the company, an arrangement that enabled them to collaborate informally on their songwriting without a formal supervisory structure.

23. The MacLen Agreement was contemporaneous with, and in contemplation of, a second agreement (the "1965 Publishing Agreement") between MacLen, Nems, Paul McCartney, John Lennon, and Northern Songs. The 1965 Publishing Agreement states that the earlier 1963 Publishing Agreement "shall not apply to any musical composition hereafter composed by" Paul McCartney and John Lennon. Under the 1965 Publishing Agreement, MacLen agreed to submit to Northern Songs compositions created pursuant to the MacLen Agreement and to assign Northern Songs the "full copyright for all countries of the world" to those compositions in exchange for royalties. MacLen would then distribute the royalties it received to its controlling shareholders, Paul McCartney and John Lennon. As with the MacLen Agreement, the 1965 Publishing Agreement purports to transfer each relevant copyright interest only "so far as it is assignable by law."

24. The MacLen Agreement and the 1965 Publishing Agreement are collectively referred to herein as the "1965 Agreements."

25. The 1962 Publishing Agreement, the 1963 Publishing Agreement, and the 1965 Publishing Agreement are collectively referred to herein as the "Publishing Agreements."

26. Between 1965 and 1971, Paul McCartney and John Lennon jointly composed dozens of musical works (including music and words) pursuant to the 1965 Agreements, occasionally with the contributions of other authors. The works Paul McCartney and John Lennon co-authored between 1965 and 1971 include some of The Beatles' best known songs, such as "Ticket to Ride," which was released in 1965 and registered with the U.S. Copyright Office under registration number EFO 106878; "Yesterday," which was released in 1965 and registered with the U.S. Copyright Office under registration numbers EF 30816 and EFO 108812; "Hey Jude," which was released in 1968 and registered with the U.S. Copyright Office under registration numbers EFO 130571 and EFO 71915; and "Let it Be," which was released in 1970 and registered with the U.S. Copyright Office under registration number

EFO 140570.  Each of these songs, and dozens of others, were registered with the Copyright Office as joint works of authorship by Paul McCartney and John Lennon.

27. Through a series of subsequent transfers, Defendants acquired Beechwood's and Northern Songs' copyright interests in the musical works discussed above, and Sony/ATV Music Publishing LLC claims to be the successor to the publishers' interests under the Publishing Agreements.  This lawsuit concerns Paul McCartney's right to terminate his grant of the copyright interests that he transferred between 1962 and early 1971 to music publishers as a result of the Publishing Agreements, for which Sony/ATV Tunes LLC and/or Sony/ATV Music Publishing LLC claim to be the successors in interest.  A list of the musical works that are the subject of this lawsuit, including the works' registration numbers with the U.S. Copyright Office, is attached as Exhibit A.

*The Termination Notices*

28. Starting in October 2008, Paul McCartney served and recorded in the U.S. Copyright Office termination notices pursuant to 17 U.S.C. § 304(c) to reclaim his copyright interests in his musical compositions.  The termination notices served on Defendant Sony/ATV Tunes LLC and its affiliates and recorded in the Copyright Office include the following:

29. **Document No. V3573D106** (Ex. B-1 attached) was served on Beechwood Music Corp. c/o EMI Music Publishing[2] on October 6, 2008 and recorded in the Copyright Office on October 15, 2008. It covers the title "Love Me Do," Reg. No. EF 28620, which was copyrighted October 5, 1962, with a termination effective date of October 5, 2018.

30. **Document No. V3535D051** (Ex. B-2 attached) was served on Beechwood Music Corp. c/o EMI Music Publishing on November 30, 2009 and recorded in the Copyright Office on December 2, 2009. It covers the title "P.S. I Love You," Reg. No. EU 799728, which was copyrighted November 26, 1963, with a termination effective date of November 26, 2019.

---

[2] According to Defendants, "[s]ince 2012 Sony/ATV has administered EMI Music Publishing." https://www.sonyatv.com/en/about (last visited Jan. 13, 2017).

8

31.     **Document No. V3582D133** (Ex. B-3 attached) was served on Sony/ATV Tunes LLC on August 4, 2009 and recorded in the Copyright Office on August 7, 2009. It covers the title "Thank You Girl," Reg. No. EU 783064, which was copyrighted August 2, 1963, with a termination effective date of August 2, 2019.

32.     **Document No. V3582D151** (Ex. B-4 attached) was served on Conrad Music c/o Arc Music Corp. on August 4, 2009 and recorded in the Copyright Office on August 7, 2009. It covers the title "Thank You Girl," Reg. No. EU 783064, which was copyrighted August 2, 1963, with a termination effective date of August 2, 2019.[3]

33.     **Document No. V3504D193** (Ex. B-5 attached) was served on EMI Unart Catalog, Inc. on November 19, 2009 and recorded in the Copyright Office on November 23, 2009. It covers the title "Bad to Me" and three other titles. As noted above, Defendants administer EMI's catalog.

34.     **Document No. V3556D489** (Ex. B-6 attached) was served on Sony/ATV Tunes LLC on November 19, 2009 and recorded in the Copyright Office on November 23, 2009. It covers the title "Bad to Me" and nine other titles.

35.     **Document No. V3546D729** (Ex. B-7 attached) was served on Sony/ATV Tunes LLC on November 23, 2009 and recorded in the Copyright Office on November 30, 2009. It covers the title "I Want to Hold Your Hand," Reg. No. EF 28849, which was copyrighted in 1963, with a termination effective date of November 20, 2019.

36.     **Document No. V3591D712** (Ex. B-8 attached) was served on Sony/ATV Tunes LLC on May 3, 2010 and recorded in the Copyright Office on May 7, 2010. It covers the title "All I've Got to Do" and six other titles.

---

[3] In some instances, a given registered work appears on more than one Termination Notice. This is because, in addition to Defendants, other publishing companies have asserted partial ownership interests in particular works.

37. **Document No. V3600D960** (Ex. B-9 attached) was served on Sony/ATV Tunes LLC on December 22, 2010 and recorded in the Copyright Office on December 17, 2010. It covers the title "All I've Got to Do" and 61 other titles.[4]

38. **Document No. V3604D373** (Ex. B-10 attached) was served on Sony/ATV Tunes LLC on December 21, 2011 and was recorded December 27, 2011. It covers the title "Another Girl" and 38 other titles.

39. **Document No. V3622D267** (Ex. B-11 attached) was served on Sony/ATV Tunes LLC on December 24, 2012 and recorded December 28, 2012. It covers the title "And Your Bird Can Sing" and 22 other titles.

40. **Document No. V3621D222** (Ex. B-12 attached) was served on Sony/ATV Tunes, LLC on December 23, 2013 and recorded December 26, 2013. It covers the title "All You Need Is Love" and 23 other titles.

41. **Document No. V3630D260** (Ex. B-13 attached) was served on Sony/ATV Tunes LLC on December 22, 2014 and recorded in the Copyright Office on January 5, 2015. It covers the title "All Together Now" and 32 other titles.

42. **Document No. V9914D377** (Ex. B-14 attached) was served on Sony/ATV Tunes LLC on December 7, 2015 and recorded in the Copyright Office on December 14, 2015. It covers the title "Ballad of John & Yoko" and 32 other titles.

43. An additional Termination Notice (Ex. B-15 attached) was served on Sony/ATV Tunes LLC on October 28, 2016 and filed in the Copyright Office.[5] It covers the title "Across the Universe" and 25 other titles.

44. The termination notices that Paul McCartney served on Sony/ATV Tunes LLC and recorded in the Copyright Office comply with 17 U.S.C. § 304(c) and are hereinafter

---

[4] In some instances, Paul McCartney and John Lennon created multiple versions of a particular musical title and separately registered these different versions with the Copyright Office. Additionally, they registered some titles as both unpublished and published works. Accordingly, some titles have more than one associated registration number.

[5] The Copyright Office has not yet provided a Certificate of Recordation for the Termination Notice served on Sony/ATV Tunes LLC on October 28, 2016.

referred to as the "Termination Notices." For each title recited in each of the Termination Notices listed above, the effective date of the termination is 56 years after the date the relevant copyright was first acquired. Moreover, each Termination Notice was served and recorded within 10 years before the effective date of termination. *See* 17 U.S.C. § 304(c)(4).

45. John and Lee Eastman, father and son, are attorneys who represent Paul McCartney. Each Termination Notice was signed by Paul McCartney's attorney Lee Eastman.

*The Present Dispute*

46. For years following service of the first Termination Notices, Defendants gave no indication to Paul McCartney that they contested the efficacy of Paul McCartney's Termination Notices. Defendants' affiliates did, however, oppose at least one other artist's terminations of transfers under the terms of the 1976 Copyright Act.

47. When members of the band Duran Duran attempted to exercise their rights to terminate transfers made in the early 1980s to their publisher under U.S. copyright law, the publisher, Sony/ATV subsidiary Gloucester Place Music, sued the band members for breach of contract in the United Kingdom. On December 2, 2016, the High Court of Justice of England and Wales issued an opinion in the Duran Duran case, captioned *Gloucester Place Music Ltd. v. Le Bon*, [2016] EWHC 3091 (Ch). In that opinion, the High Court adopted Sony/ATV's position that the original publishing agreements between Duran Duran's members and its publishing company (which were subject solely to English law and did not explicitly refer to U.S. termination rights) precluded Duran Duran's members from exercising their termination rights. Because the High Court found that the band members did not submit any admissible expert evidence on applicable U.S. law, the High Court declined to consider the band members' argument that a U.S. court would not allow a claim for damages for breach of a contract because the statutory termination right supersedes any contractual right.[6]

---

[6] The Duran Duran band members attempted to exercise their termination rights under 17 U.S.C. § 203, which is similar to Section 304(c) but applies to grants executed after January 1, 1978. The High Court assumed that the band members were aware, at least in general terms, of the existence of Section 203 when they entered agreements transferring their work in the early 1980s. In contrast, at the time Paul McCartney signed the Publishing Agreements in the 1960s, the termination provisions of the 1976 Copyright Act had not yet been enacted.

referred to as the "Termination Notices." For each title recited in each of the Termination Notices listed above, the effective date of the termination is 56 years after the date the relevant copyright was first acquired. Moreover, each Termination Notice was served and recorded within 10 years before the effective date of termination. *See* 17 U.S.C. § 304(c)(4).

45. John and Lee Eastman, father and son, are attorneys who represent Paul McCartney. Each Termination Notice was signed by Paul McCartney's attorney Lee Eastman.

***The Present Dispute***

46. For years following service of the first Termination Notices, Defendants gave no indication to Paul McCartney that they contested the efficacy of Paul McCartney's Termination Notices. Defendants' affiliates did, however, oppose at least one other artist's terminations of transfers under the terms of the 1976 Copyright Act.

47. When members of the band Duran Duran attempted to exercise their rights to terminate transfers made in the early 1980s to their publisher under U.S. copyright law, the publisher, Sony/ATV subsidiary Gloucester Place Music, sued the band members for breach of contract in the United Kingdom. On December 2, 2016, the High Court of Justice of England and Wales issued an opinion in the Duran Duran case, captioned *Gloucester Place Music Ltd. v. Le Bon*, [2016] EWHC 3091 (Ch). In that opinion, the High Court adopted Sony/ATV's position that the original publishing agreements between Duran Duran's members and its publishing company (which were subject solely to English law and did not explicitly refer to U.S. termination rights) precluded Duran Duran's members from exercising their termination rights. Because the High Court found that the band members did not submit any admissible expert evidence on applicable U.S. law, the High Court declined to consider the band members' argument that a U.S. court would not allow a claim for damages for breach of a contract because the statutory termination right supersedes any contractual right.[6]

---

[6] The Duran Duran band members attempted to exercise their termination rights under 17 U.S.C. § 203, which is similar to Section 304(c) but applies to grants executed after January 1, 1978. The High Court assumed that the band members were aware, at least in general terms, of the existence of Section 203 when they entered agreements transferring their work in the early 1980s. In contrast, at the time Paul McCartney signed the Publishing Agreements in the 1960s, the termination provisions of the 1976 Copyright Act had not yet been enacted.

48. Around the time of the *Gloucester Place Music* decision, Sony/ATV executives indicated to Paul McCartney's representatives that Sony/ATV would try to use the decision against Paul McCartney.

49. Shortly before the *Gloucester Place Music* decision, Sony/ATV's executive vice president and head of business affairs, Peter Brodsky, indicated to Paul McCartney's attorney, Lee Eastman, that Paul McCartney "will be more interested in talking" to Sony/ATV about his copyrights if Sony/ATV were to win the lawsuit with Duran Duran.

50. A few days before the *Gloucester Place Music* decision, Sony/ATV's chairman and CEO, Martin Bandier, encountered Lee Eastman at a concert and indicated to Mr. Eastman that Paul McCartney would "need to discuss how to handle his copyrights" in view of the case. Bandier seemed to have a strong feeling that Sony/ATV would prevail in the *Gloucester Place Music* case.

51. Subsequently, on December 13, 2016, just before a National Music Publisher Association board of directors meeting, Mr. Bandier approached Lee Eastman and, after saying hello and shaking hands, said, "I sent your father the full decision to show how the rights are exactly the same." It was clear Bandier was referencing the recent Duran Duran decision and its impact on Paul McCartney's U.S. reversion rights.

52. On December 16, 2016, counsel for Paul McCartney sent a letter to Mr. Bandier asking him to explain his basis, if any, for suggesting that Paul McCartney's Termination Notices are not effective. (Ex. C-1 attached.) The letter warned that if necessary, Paul McCartney would file a declaratory judgment action.

53. Mr. Bandier responded in writing on December 19, 2016. (Ex. C-2 attached.) His response stated, in relevant part: "The previously served notices of termination enclosed with your December 16th letter constitute an effective exercise under Section 304(c) and will become effective on the dates stated in the notices." Thus, Defendants have conceded that Paul McCartney's Termination Notices are valid and that the Termination Notices will terminate Paul

McCartney's transfers of his copyright interests to Defendants' predecessors in interest for the musical works listed in the Termination Notices on the effective dates listed therein.

54. Notably absent from Mr. Bandier's response was any reference to Paul McCartney's rights of termination in view of Paul McCartney's contracts with Sony/ATV's predecessors. On December 21, 2016, counsel for Paul McCartney sent another letter to Mr. Bandier. (Ex. C-3 attached.) The letter explained: "As we begin to think about our plans for these works following termination, you will understand our desire that no possibility of litigation cloud our title." Accordingly, Paul McCartney's counsel requested that Mr. Bandier "clarify that Sony/ATV not only regards the termination notices to be effective under Section 304(c) of the Copyright Act, but also that the termination notices give rise to no valid claim, in contract or otherwise."

55. Bandier responded by email the same day, December 21, 2016. (Ex. C-4 attached.) He indicated that he was "on holiday" but promised that he would get back to Paul McCartney's counsel in early January.

56. On January 5, 2017, Bandier emailed Paul McCartney's counsel. (Ex. C-5 attached.) Bandier's January 5, 2017 message did not indicate whether Sony/ATV believed that the Termination Notices give rise to any legal claims against Paul McCartney. Instead, the message indicated that Sony/ATV had retained counsel. Bandier wrote: "since you have asked for certain assurances that amount to legal conclusions I have turned this matter over to our outside counsel Don Zakarin." The message further stated: "You will have a substantive response from him early next week."

57. On January 9, 2017, Paul McCartney's attorneys received an email from Defendants' New York attorney Mr. Zakarin. (Ex. C-6 attached.) The message first asserted that "SATV has no wish to engage in litigation with Paul" McCartney. Nevertheless, the message refused to answer the question that Paul McCartney's counsel had asked on December 21, 2016, namely, whether "Sony/ATV not only regards the termination notices to be effective under Section 304(c) of the Copyright Act, but also that the termination notices give rise to no

13

valid claim, in contract or otherwise." Instead, Defendants' attorney wrote that the Duran Duran case "has yet to conclude" and that "with respect to your request for confirmation regarding the relinquishment of any possible rights of SATV, it seems to SATV to be premature to discuss theoretical future events which I know that SATV hopes will never arise and therefore will not warrant or necessitate any discussion."

58. The December 21, 2016 letter from Paul McCartney's counsel explained Paul McCartney's desire that no possibility of litigation cloud his title to his works and invited Defendants to confirm that they do not intend to take legal action against him over the Termination Notices. Defendants have refused to provide such confirmation and have thus attempted to reserve Defendants' right to assert that once Paul McCartney's terminations go into effect, Paul McCartney will have breached his contractual obligations to Defendants. Rather than provide clear assurances to Paul McCartney that Defendants will not challenge his exercise of his termination rights, Defendants are clearly reserving their rights pending the final outcome of the Duran Duran litigation in the U.K. If that goes as Defendants hope, Defendants evidently intend to challenge Paul McCartney's exercise of his termination rights on similar contractual grounds. Defendants' position is contrary to 17 U.S.C. § 304(c)(5), which states that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." Because the earliest of Paul McCartney's terminations will take effect in 2018, a judicial declaration is necessary and appropriate at this time so that Paul McCartney can rely on quiet, unclouded title to his rights.

**COUNT I**
**DECLARATORY JUDGMENT OF NO BREACH OF CONTRACT**

59. Plaintiff hereby incorporates by reference paragraphs 1 through 58 above as if fully set forth herein.

60. Defendants have refused to acknowledge that Defendants not only regard Paul McCartney's Termination Notices to be effective under Section 304(c) of the Copyright Act, but also that the Termination Notices give rise to no valid contractual claim against Paul McCartney.

Instead, Defendants have attempted to reserve their rights to challenge Paul McCartney's exercise of his termination rights on contractual grounds.

61. Paul McCartney denies that his exercise of his termination rights represents a breach of any contract and denies that the Publishing Agreements are lawful or enforceable against him to the extent that they conflict with Paul McCartney's Termination Notices.

62. There exists an actual and justiciable controversy between Defendants and Paul McCartney with respect to whether Paul McCartney's exercise of his termination rights represents a breach of any of the Publishing Agreements and whether the Publishing Agreements are unlawful and/or enforceable against Paul McCartney to the extent that they conflict with Paul McCartney's Termination Notices.

63. Paul McCartney seeks a declaration that his exercise of his termination rights does not represent a breach of any Publishing Agreement. Paul McCartney also seeks a declaratory judgment that the Publishing Agreements are unlawful and/or unenforceable against Paul McCartney to the extent that they conflict with Paul McCartney's Termination Notices. A judicial declaration is necessary and appropriate at this time so that Paul McCartney can rely on quiet, unclouded title to his rights.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Paul McCartney prays for relief against Defendants as follows:

A. A declaration that Paul McCartney's exercise of his termination rights does not represent a breach of any of the Publishing Agreements;

B. A declaration that the Publishing Agreements are unlawful and/or unenforceable against Paul McCartney to the extent that they conflict with Paul McCartney's Termination Notices;

C. An order awarding Paul McCartney his costs and fees, including his attorneys' fees; and

D. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable in this action.

Dated: San Francisco, California
January 18, 2017

Respectfully submitted,

By: /s/ Michael A. Jacobs
Michael A. Jacobs (pro hac vice motion forthcoming)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
415.268.7000
mjacobs@mofo.com

Attorneys for Plaintiff

sf-3723890