H4J5mccC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JAMES PAUL McCARTNEY,

4               Plaintiff,          New York, N.Y.

5         v.             17 Civ. 363 (ER)

6   SONY/ATV MUSIC PUBLISHING,
    LLC, *et al.*,
7

               Defendants.
8
    ------------------------------x
9
                               April 19, 2017
10                              10:00 a.m.

11   Before:

12                 HON. EDGARDO RAMOS,

13                              District Judge

14

15                    APPEARANCES
16

17   MORRISON & FOERSTER, LLP
        Attorneys for Plaintiff
18   BY:  MICHAEL A. JACOBS
        J. ALEXANDER LAWRENCE
19       ROMAN A. SWOOPES

20

21   PRYOR CASHMAN, LLP
        Attorneys for Defendants
22   BY:  TOM J. FERBER
       DONALD S. ZAKARIN

23

24

25

H4J5mccC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4          MR. JACOBS:  Good morning, your Honor.  Michael Jacobs

5     from Morrison & Foerster.  With me is Roman Swoopes and Alex

6     Lawrence.

7          THE COURT:  Good morning.

8          MR. ZAKARIN:  Good morning, your Honor.  Don Zakarin

9     from Pryor Cashman for Sony/ATV, and with me is my partner Tom

10    Ferber.

11         THE COURT:  And good morning to you, all.

12         This matter is on before me for a pre-motion

13    conference on the defendant's request for leave to file a

14    motion to dismiss on a number of grounds, however this is the

15    first time that this case is before me.  So, Mr. Jacobs, let me

16    give you the opportunity in the first instance to tell me a

17    little bit about your case.

18         You can remain seated or use the podium; however you

19    feel most comfortable.

20         MR. JACOBS:  Thank you, your Honor.

21         The Copyright Act has a very powerful provision

22    granting authors the right to terminate their, any grants that

23    they made prior to the extended term that starts in year 56 of

24    a copyright term.  Section 304 says that the author has the

25    right to terminate that grant notwithstanding any agreement to

H4J5mccC

the contrary.  The Sony/ATV defendants here, through a

subsidiary in the U.K., managed to work an end-run around a

similar provision of the Copyright Act, Section 203, that deals

with a slightly different period of the copyright term that is

being terminated, and they filed suit against the Duran Duran

group in the U.K., arguing to the U.K. Court that U.K. contract

law trumps the provision of the Copyright Act allowing the

author to terminate the grant of the copyright in the extended

term at issue there.  The U.K. Court ruled that it didn't

really have the provisions of the Copyright Act under U.S. law

properly before it and applying U.K. contract law ruled that

U.K. contract law trumped and that it would be a breach of the

contract that assigned -- that Duran Duran used to assign its

copyrights, it would be a breach of contract if they exercised

their U.S. copyright termination rights.

          Parenthetically, the termination right at issue here

only applies to U.S. copyrights, it doesn't apply to, for

example, U.K. copyrights or copyrights arising under any other

national copyright law.

          THE COURT:  So, what are we talking about then here?

I mean, as I understand it these copyrights, the rights

thereunder were assigned or granted in the U.K., correct?

          MR. JACOBS:  They were granted under -- let's assume

for present purposes that the agreements in question are

U.K.-governed agreements in which in the '60s The Beatles, more

H4J5mccC

precisely McCartney and Lennon, assigned their copyrights and

their compositions to publishers, and then publishers assigned

to publishers, and now it is with Sony/ATV.

        THE COURT:  Okay.

        MR. JACOBS:  So, with the Duran Duran decision behind

them, the Sony/ATV representatives, speaking with McCartney's

representatives said, in words or substance, we have a claim

against you, we have a threat against you, we have a potential

theory that can trump your otherwise valid exercise of your

termination rights.  Various words were said that led

McCartney's representatives to think soon or at some point

McCartney would be sued in the U.K. for exercising his

termination rights.

        So, to try and figure out whether there really was a

claim here letters were exchanged.  We wrote, and said:  *We*

*have exercised our termination rights.  We have sent you these*

*termination notices.  Do you dispute them?  Were they*

*rightfully exercised?*  Letter back:  *We don't dispute the*

*validity of your terminations under the Copyright Act.*  Letter

back:  *But you didn't answer the second part of this, were they*

*rightfully exercised or do you have a claim for breach?*  Answer

back:  *Well, we may or may not have a claim for breach.  It all*

*depends on what happens in the Duran Duran case.  We are not*

*saying we are going to sue you, we are not saying we will not*

*sue you, we won't give you a promise we won't sue you.  There*

H4J5mccC

1      *is a possibility, therefore, that we will sue you.*

2              And so, with that exchange of letters, we filed a

3      declaratory judgment action before your Honor.

4              THE COURT:  Assuming there is a breach, when does it

5      accrue?

6              MR. JACOBS:  That's a very good question.

7              The Copyright Act, this whole termination provision is

8      very finely crafted in the copyright Act.  The terminations

9      become effective, the first one becomes effective next year for

10     "Love Me Do," the 1962 Beatles Song.  They then roll out in

11     2018, 2019, 2020, etc., over time.

12             The claim of breach could accrue anticipatorily, I

13     suppose, now.  This is really a U.K. law question, right?  Does

14     U.K. contract law have a claim for anticipatory breach?

15     Because we have sent out the termination notices and we regard

16     them and they regard them as legally effective termination

17     notices.  So, that act has been accomplished.

18             THE COURT:  Let me ask you this.  Explain to me why,

19     if the notice is valid and they acknowledge that the notice is

20     valid, how they can have a claim of breach of contract down the

21     line?

22             MR. JACOBS:  This is the real live disagreement before

23     your Honor.  Our view is that under the "notwithstanding any

24     agreement to the contrary" language, there can be no claim of

25     breach.  Their view is that -- you can see it in the letter

H4J5mccC

1    before you, we really have a disagreement about what law

2    controls here.  We are asking for a declaration from your Honor

3    that U.S. copyright law answers the beginning and end of this

4    question and that with the "notwithstanding any agreement to

5    the contrary" language, there can be no claim of breach.

6            Now, that doesn't answer all the litigation that might

7    flow from these very valuable rights.  Let's say they go to

8    Zimbabwe and file a suit under Zimbabwe law and say, under

9    Zimbabwe law there is a claim, Zimbabwe law is written that

10   says any time anybody anywhere in the world exercises a

11   termination right there is a breach of Zimbabwe law.

12           I use this, obviously, just to set up a hypothetical

13   here.  The fact that we may get a ruling from your Honor -- I

14   am sort of anticipating where you may go here -- doesn't answer

15   all the questions that might arise in this dispute between the

16   parties, but with a ruling from this Court that Section 304

17   means what it says and that "notwithstanding any agreement to

18   the contrary" means notwithstanding any agreement under any

19   potentially applicable law, then we will have accomplished our

20   objectives for the moment before your Honor.

21           THE COURT:  So, if I rule in the way that you ask, the

22   U.S. rights will be determined but can you still be sued for

23   breach in the united Kingdom?

24           MR. JACOBS:  We believe that if we get such a ruling

25   from your Honor, we will have potentially claim or issue

H4J5mccC

preclusion defenses.  Conceivably if Sony/ATV sued us in the

U.K. we could be back before you saying, your Honor, they're

trifling with your jurisdiction here.  You ruled there is no

claim of breech, they're going elsewhere to pursue a claim of

breach.

        So, there are various possibilities for heading off

such a lawsuit were it to be brought.  Number one, the

declaratory value of this would be very significant.  There is

plainly confusion about how this provision of the Copyright Act

should be applied under foreign law by foreign courts and a

clear declaration from your Honor that, as to U.S. copyright

law Section 304 is the beginning and the end of the answer, it

would go a long way toward resolving this matter.

        THE COURT:  Where, from your perspective, is the

Duran Duran case, procedurally?

        MR. JACOBS:  It is on appeal.

        THE COURT:  And what can happen?  What is the range of

outcomes that can happen and how does that affect your case

here?

        MR. JACOBS:  I am uncertain of the full range of

potential outcomes under U.K. procedure.  On appeal,

Duran Duran will argue that the High Court misapplied the

material before it on Section 203, the corresponding provision

of the Copyright Act that is at issue there -- I am nearly

certain -- and they will argue that the High Court got it wrong

H4J5mccC

1   in concluding that it misunderstood U.S. copyright law or it

2   misapprehended the effect of that under U.K. contract law

3   principles.  I imagine that is what they will argue and,

4   conceivably, they could be successful.

5           The lower court, the so-called High Court ruling reads

6   in the nature of an evidentiary conclusion that U.S. law was

7   not properly adduced.  The threat to us is that with the

8   effective date coming soon, it's time to start thinking about

9   how these rights will be exploited post-termination effective

10  date.  And with this cloud hanging out over us that we may be

11  sued in the U.K., we have a cloud on our title.  In a sense

12  this is sort of like a quiet title action where we want to

13  quiet the title to the extended term of copyright for which the

14  concededly effective termination notices have been set.

15          THE COURT:  Can I truly quiet title?  I mean, if there

16  is this question as to how the copyright laws interact with the

17  laws of the United Kingdom -- and, why are we here, by the way?

18          MR. JACOBS:  We are here because this is a U.S.

19  defendant.  We have an issue of U.S. copyright law.  Very

20  strong copyright policy in favor of authors, very clear

21  provisions, and they have told us that while they regard the

22  termination notices as effective, they are not conceding that

23  those termination rights were rightfully exercised as a matter

24  of an agreement they say is to the contrary.

25          THE COURT:  Was any relevant or any document that is

H4J5mccC

1    at issue in this case, any contract, any grant of a right, were

2    any of those executed here in the United States?

3          MR. JACOBS:  I don't believe -- I wouldn't want to

4    double check, your Honor, but our theory does not rest on the

5    fact that the instruments themselves are U.S. law instruments.

6          THE COURT:  They were entered into, presumably, as

7    early as 1962, at in the case of "Love Me Do?"

8          MR. JACOBS:  That's right, your Honor.

9          THE COURT:  Is there only one song associated with

10   each termination notice or multiple?

11         MR. JACOBS:  Multiple songs are -- the notices are

12   prescribed under the copyright office regulations and I believe

13   some of the notices contain multiple songs.  There is a window

14   during which you can transmit the notice, it gets recorded in

15   the copyright office.  After the copyright office reviews it --

16   and yes, the notices that were sent have multiple songs

17   associated with them.

18         THE COURT:  Is the legal issue at play in the

19   Duran Duran action the same as the legal issue in this case?

20         MR. JACOBS:  Very close.  Close enough that our

21   adversary here wishes to hold out the prospect that if

22   Duran Duran goes their way, they could sue us for breach in the

23   U.K.  The language in 203 is the same, it is "notwithstanding

24   any agreement to the contrary."  It is a different period of

25   copyright that's terminated and, of course, if we were

H4J5mccC

1    litigating this in the U.K. the agreements are different, they

2    were entered into at different times.  Particularly here, the

3    extended term at issue was enacted first with the '76 Copyright

4    Act, so the assignments at issue here could not have been

5    entered into in anticipatory grant of the extended term.  The

6    extended term didn't exist.

7         So, let me just give you sort of the decision logic

8    that we propose for this case.

9         This is a question of U.S. law.  The Copyright Act

10   says you don't need to look to conflicts of laws principles to

11   decide this case because it says notwithstanding any agreement

12   to the contrary and the ruling we seek is that ruling, that

13   U.S. law controls here, U.S. law says notwithstanding any

14   agreement to the contrary, that means notwithstanding any

15   agreement to the contrary regardless of where it's entered

16   into.

17        They have argued and will surely argue that, actually,

18   to get the ruling we seek of no breach, you would need to treat

19   questions of U.K. contract law.  That's their pitch to you.

20        Our argument is no, you don't need to, but if you do,

21   we will prove to you that as a matter of U.K. law properly

22   considered, U.K. law would defer to U.S. copyright law on this

23   question.  There is a famous case called Campbell Connelly in

24   the U.K. that stands for that principle.

25        THE COURT:  Would we have to wait until the resolution

H4J5mccC

1    of the appeal in the Duran Duran case to see whether or not

2    that's the case?

3        MR. JACOBS:  I think this case arises now and so we

4    would do our best to prove to you what U.K. law holds on this

5    question.

6        The Duran Duran High Court said we don't properly have

7    U.S. copyright law before us so we are just ruling on U.K.

8    principles.  But, the reason I went off on this path is that we

9    would also argue to you that as a matter of proper contract

10   interpretation, given the fact that these grants were entered

11   into before the extended term existed, there can be no claim of

12   breach.  Again, we would adduce, if we were in this alternative

13   world where we are looking at U.K. law, we would adduce U.K.

14   interpretive principles to address that question.

15       But, our view is you don't need to go down that path.

16   Sort of forecasting for you the way briefing may occur, we may

17   not get a threshold ruling from you that I don't need to

18   consider U.K. law.  So, you may see a brief from us that says

19   our view is U.S. law answers all the questions here but should

20   your Honor disagree or should your Honor want to hear more,

21   here is "the more" about how this would properly be treated

22   under U.K. law because we are asking you for quiet title to

23   these terminated rights.

24       THE COURT:  I guess I may have asked this question in

25   a slightly different way, but why isn't there acknowledgment

H4J5mccC

1    that these termination notices are valid enough for you?

2            MR. JACOBS:  What we would need from them is an

3    acknowledgment that they are valid and rightfully exercised,

4    notwithstanding any agreement to the contrary, just like the

5    copyright law says.  That's what they haven't given us.  They

6    have not given us a covenant not to sue.  They have not said we

7    are not going to see you in the U.K. no matter what.  What they

8    are asking you on this proposed motion to dismiss, they're

9    asking you to let them hold out the threat of litigation in the

10   U.K. and not adjudicate the declaratory judgment we have

11   brought in the U.S.  That, to us, just seems like a -- it has

12   to be a logical contradiction under declaratory judgment

13   jurisprudence.  It can't be that they can hold out a threat of

14   litigation and then say to you there is no ripe dispute.  They

15   know how to end this case.  They can grant us a covenant not to

16   sue.

17           THE COURT:  Mr. Zakarin or Mr. Ferber, why don't you

18   grant them a covenant not to sue?  And you can remain seated,

19   too, by the way, if you wish.  Whatever makes you more

20   comfortable.

21           MR. ZAKARIN:  I sit all day so I figure if I have a

22   chant to stand I might as well.

23           THE COURT:  Sure.

24           MR. ZAKARIN:  I am more accustomed to it.

25           Let me answer that question first and address it.  The

H4J5mccC

first thing they ask is would you acknowledge that the

termination notices are valid and were properly exercised under

Section 304.  And we acknowledge that.  They didn't ask for

anything more.  They then ratcheted it up, and you can see in

the exhibits to the complaint, the correspondence went back and

forth.  Then they said we want you to agree to waive, for all

time, any possible suit for breach of contract under these

contracts in the U.K. that you may have.  And what we said to

them is we have no intention of suing.  We have no plan to sue.

And, in any event, it is way premature because the law in the

U.K. on this issue is unsettled and we don't know what

Duran Duran is going -- that was even before Duran Duran had

entered the judgment.  It has since been appealed.

        So, it is premature.  We said we have no intention of

pursuing you, it is premature in any event, we have every hope

of working with you.  There is no contemplation of bringing a

case but not to waive, not to absolutely, categorically, under

all conditions waive any theoretical potential right that may

exist under U.K. law.  We have not waived absolutely,

unconditionally, any theoretical right that may or may not come

to exist in the future.

        THE COURT:  But do I understand this correctly?  Do I

understand your acknowledgment of the validity of the

termination notices to mean that the plaintiff has an absolute

right to take back whatever rights he may have given up?

H4J5mccC

1             MR. ZAKARIN:  That is his Congress-given right under

2       Section 304.  They have a right to terminate grants that were

3       previously made.  These were U.K. grants between '62 and '65 to

4       predecessors of Sony/ATV made by Lennon, made by McCartney.

5       Sony/ATV has obtained into the extended renewal term, the John

6       Lennon share of the compositions.  Sony/ATV will continue to

7       have the rights in both the Lennon share and the McCartney

8       share outside of the United States for the full duration of

9       copyright outside of the United States.  We are only dealing

10      with the United States.  And we have acknowledged he has the

11      right to terminate.  That's in the statute.  He has the

12      absolute right.  What they are asking is a pure U.K. issue,

13      U.K. law issue:  Is it a breach of contract?  In other words,

14      is there some compensable right in damages by virtue of my

15      having terminated these U.K. contracts in the U.S.?  I frankly

16      don't know what the answer will be from the Duran Duran case.

17      I don't know that whatever that answer may be would fully

18      settle this issue.  I do know that Sony has no intention of

19      bringing a case against McCartney in the U.K., certainly not

20      here, but if there were a case to be brought, it would be a

21      U.K. case because it is a U.K. contract.

22             The copyright issue is separate.  There is no cloud on

23      McCartney's rights.  By the way, he can't transfer those rights

24      to any song.  The earliest he can transfer, whether it is to

25      himself or anybody else other than Sony/ATV is, I believe, for

H4J5mccC

1   the first song -- "Love Me Do" -- in October 2018, a year and a

2   half from now.  That's the earliest he can convey it to anybody

3   else.  The other songs --

4           THE COURT:  So, let me ask this so that I understand.

5           MR. ZAKARIN:  Sure.

6           THE COURT:  If he does that, if the termination is

7   valid, it terminates your rights as of 2018 here in the United

8   States.  Can you still sue him in the U.K. if he attempts to

9   enforce that termination?

10          MR. ZAKARIN:  In theory -- in theory -- a case could

11  be brought for breach of contract and any damages suffered

12  thereby.  In theory.

13          THE COURT:  Only in the U.K., not in the U.S.

14          MR. ZAKARIN:  It is a U.K. contract and the parties

15  were U.K. parties.  Normally it would be the U.S. entity that

16  would be saying, hey, I can't be sued in the U.K., I'm here.

17  This is Sony/ATV, which is here.  Mr. McCartney is a U.K.

18  citizen.  He can sue Sony.  He could have brought this case, by

19  the way, right now in the U.K. for a declaration, although I

20  think he would be premature bringing it in the U.K. as well

21  because think of all the contingencies that haven't occurred:

22          The Duran Duran case has not been determined on

23  appeal.  The Duran Duran case, itself, may be factually or it

24  may be distinct as a matter of evidence.  We don't know what

25  the decisions will be and if they get through those three

H4J5mccC

contingencies in terms of just the Duran Duran case, then it's

does Sony/ATV have any real intention of suing?  It has been

the exact opposite, they have said we don't, we don't have any

intention of doing it.

        That's why we believe, putting all else to the side,

there is no declaratory judgment here.  It is so unripe, it is

so premature because there is not an existing concrete, certain

justiciable controversy.  We have said the exact opposite.

        THE COURT:  There also seems to be no dispute as to

what Lord McCartney rights would be in the U.S.

        MR. ZAKARIN:  Correct.

        THE COURT:  So, why don't you give him a covenant not

to sue in the U.S.?

        MR. ZAKARIN:  Because we don't have an intention to

sue in the U.S.  We wouldn't sue under the Copyright Act.  The

question is -- the question is -- would his termination of

Sony's rights in the U.S., which he has the right to do, would

that be a breach of the underlying contracts in the U.K.

exposing McCartney to some theoretical damage claim.  I don't

know that it does.  That's the honest truth.  I don't know that

it gives rise to such a claim.  And, as I said, I don't know

what is going to happen with Duran Duran and I don't know that

Duran Duran is going to be fully dispositive, but I believe

that what they are asking is for an absolute covenant not to

sue or a waiver, which I think is (a) premature, I think there

H4J5mccC

1    is no reason why that should be given to begin with; and I'm

2    not sure, by the way, I'm not sure that there is going to be

3    any claim that ever exists in the U.K. under the law and they

4    are asking your Honor, as we said in a very premature way, to,

5    in effect, render an advisory opinion as to what you think the

6    U.K. law on this subject, which is at the very best unsettled,

7    there is one case that has addressed this precise issue which

8    is the High Court decision in Duran Duran which is now on

9    appeal.

10           So, it's a completely unsettled issue under U.K. law

11   and they're asking, in effect, your Honor, to determine U.K.

12   law.

13           THE COURT:  Is there another level beyond the

14   appellate court that the case is currently before, the

15   Duran Duran case?

16           MR. ZAKARIN:  You mean can it be taken up above that?

17           THE COURT:  Yes.

18           MR. ZAKARIN:  The answer is I don't know, your Honor.

19   I don't think so but I don't profess to be an expert on the

20   U.K. judicial system, I am barely familiar with this judicial

21   system.

22           THE COURT:  And what law applies in this case?

23           MR. ZAKARIN:  In this case?

24           THE COURT:  Yes.

25           MR. ZAKARIN:  I don't think there is an issue of

1    copyright law in this case at all because the issue of

2    copyright law here is do they have the right to terminate?

3    Yes.  Have they validly exercised that right to terminate?

4    Yes.  Will those terminations become effective on the dates

5    stated in their termination notices under Section 304?  Yes.

6    That disposes of the copyright issue.  Then the sole issue is,

7    is doing so, under U.K. law, a breach of the contract.  And

8    that issue, as I have said, is a U.K. issue that we have no

9    intention of pursuing regardless of the outcome of the

10   Duran Duran case which itself is uncertain, premature, and even

11   if it is upheld on appeal, doesn't necessarily determine

12   whether this would be a breach of contract under these

13   contracts under U.K. law.

14        THE COURT:  I'm sorry.  Did I understand you to say

15   that even if it is determined that under U.K. law you have a

16   cause of action for breach of contract in the U.K., you are

17   not -- it is not your current intention to enforce that right?

18        MR. ZAKARIN:  Correct.  We have said that.  We have

19   said that clearly that we have no intention at the current

20   time -- and I don't know that it will ever change but we are

21   not prepared to forever waive that right, but we have said we

22   do not have any present intention, regardless of what the

23   outcome of the Duran Duran case is, of bringing a breach of

24   contract case in the U.K.  We are not prepared to forswear that

25   right for all time.  I can't speak to the future, what may

H4J5mccC

1    happen five years from now, three years from now, but I can say

2    and I know the management and I have spoken with the management

3    of Sony, they don't have any intention of initiating a breach

4    of contract case against Mr. McCartney upon the effectiveness

5    of the termination of "Love Me Do" or the next song, or the

6    next song, or the next song.  They have no intention of doing

7    that.

8              So, this is, as I have said, a very premature case and

9    it's a case that is not a justiciable controversy warranted by

10   the positions of the parties.

11             THE COURT:  I guess a couple of questions on ripeness.

12             I guess there is, on the one hand, the question of

13   U.K. law and whether it is sufficiently settled at this point

14   and what, if any changes, may come about as a result of the

15   Duran Duran case but there is also the question of the

16   termination date.  So, there is an actual date that is before

17   us that is not that far in the future where -- I mean, I

18   understand the quiet title example and why shouldn't

19   Mr. McCartney be entitled to ask a Court for some level of

20   comfort that his rights are acknowledged, it is my

21   understanding, by every party in this room, that they will not

22   be tampered with.

23             MR. ZAKARIN:  Well, if I can, his title is not being

24   questioned.  His ability to convey his rights starting in 2018

25   is not being questioned.  That's the effectiveness of your

H4J5mccC

1    termination notices are valid, your exercise of the right is

2    valid and the termination would be effective when it becomes

3    effective which is the effective date.  As I have said, he

4    can't convey to anybody but Sony/ATV until the effective date

5    of each termination notice.

6            THE COURT:  But I guess it's small solace to say well,

7    you can convey it to anyone after the termination but we are

8    going to sue you.

9            MR. ZAKARIN:  I understand that that is the

10   theoretical risk that exists but that's not what a declaratory

11   judgment is to eliminate and indeed the Dow Jones case which is

12   one of the cases we cited to your Honor is dead on and, indeed,

13   that was even further advanced because Dow Jones actually got

14   sued for libel in the U.K. and the Court still dismissed it as

15   being unripe because of the uncertainty, to a great extent, of

16   what U.K. law really was on the issue; and (b), because there

17   is no indication, indeed, there was a contrary indication that

18   Dow Jones would be sued or any judgment obtained in the U.K.

19   would be pursued here.

20           So, that case is even closer to being a ripe case and

21   the District Court said this isn't ripe.  And there are issues

22   of uncertain U.K. law and the Second Circuit affirmed that.

23           THE COURT:  Thank you.

24           Mr. Jacobs.

25           MR. JACOBS:  Briefly, your Honor.

1          To be clear, we are not asking you to decide U.K.

2    contract law.  We are asking you to decide that under U.S.

3    copyright law, the "notwithstanding any agreement to the

4    contrary" language means regardless of where that contract is

5    entered into.  It is a very powerful doctrine.

6          The cases have, for example, in the Ray Charles case,

7    Ray Charles did a deal -- the ray Charles estate did a deal

8    with the heirs and said we are going to give each of you

9    $500,000 but you can have no claim of any kind against the

10   foundation that was set up.  The heirs then exercised their

11   statutory termination rights.  The Ray Charles foundation said

12   that's fine, they're valid, they're validly exercised, but we

13   hold out the prospect of getting our $500,000 back.  The

14   District Court in that case said no matter how you cut it, what

15   they're trying to do is get around the "notwithstanding any

16   agreement to the contrary" language.  And the threat that you

17   might lose your $500,000 bequest is enough to give rise to a

18   dispute and, more importantly for purposes of the holding, Ray

19   Charles Foundation cannot get that $500,000 back.  Under state

20   law principles that contract arguably should be enforceable.

21         So, it is a very powerful doctrine here.  And to

22   merely transport the dispute to U.K. law doesn't change how

23   powerful the doctrine is, nor does it change what we are really

24   asking you to decide, that as between these parties before this

25   Court under U.S. Copyright Law, there is no claim of breach and

H4J5mccC

1    U.S. law controls.

2              If they were right that their whole theory was that

3    they're asking to you decide a question of U.K. law, they could

4    stipulate to judgment now as to the effectiveness of 304 under

5    U.S. Copyright Law and the notwithstanding any agreement to the

6    contrary because, in their view, that doesn't answer any of the

7    questions.  For us it answers nearly all the questions and

8    that's all we are asking you to decide.

9              THE COURT:  I guess you are here because you want to

10   avoid litigation later but here we are in litigation so why not

11   wait and see how things play out?

12             MR. JACOBS:  Because this is a very clever maneuver by

13   a holder of rights who wants to improve its negotiating

14   position and exercise leverage over Paul McCartney by holding

15   out the threat of litigation in a claim of breach.  They're not

16   willing to grant a covenant not to sue even though this is so

17   theoretical, so uncertain.  They're not willing to give us the

18   legal certainty that any licensor would need, any owner of

19   rights would need to go out and exploit his rights.  There is a

20   threat not only against Paul McCartney of a claim breach, there

21   is a claim, potentially, for tortious interference that might

22   lie against the parties that negotiate with him.  And so, the

23   sole and exclusive reason we are before you is to resolve legal

24   uncertainty that they have created over what should be a very

25   clear exercise of statutory rights.

H4J5mccC

```
 1              THE COURT:  Thank you.

 2              I think the threshold question for me is whether or

 3    not to grant leave and I think leave is certainly appropriate

 4    in this case.  The assertions, the arguments that are being

 5    made by the defendants are not wholly without merit and may

 6    indeed be colorable, so you will be granted leave to file your

 7    motion.  How much time do you want?

 8              MR. ZAKARIN:  Normally I would not ask for much time.

 9    I am in the middle of -- I just finished a trial last week in

10    Washington, I have got four weeks to get in findings of fact in

11    this case which is a six-week trial, so I would only ask maybe

12    by the first week in June, if that's possible.  I know that's

13    late.

14              THE COURT:  That's about six weeks, that's fine.

15              Mr. Jacobs, how much time to respond?

16              MR. JACOBS:  We will take four weeks, your Honor.

17              THE COURT:  Very well.  So, the first Friday in June

18    and four weeks after that, and then I will give you two weeks

19    to reply.

20              MR. ZAKARIN:  Thank you, your Honor.

21              MR. JACOBS:  Your Honor, can I raise a related issue?

22              THE COURT:  Yes.

23              MR. JACOBS:  It is a matter of your procedure and how

24    it would work in a situation like that.

25              We think we could crystallize the dispute before your
```

H4J5mccC

1  Honor as well as demonstrate that their theory is without legal

2  merit by filing a very early motion for summary judgment.  We

3  think the Copyright Act, the statutory language is clear, the

4  cases are clear, and it would make very sharp for you exactly

5  what we are asking you to decide and how we are asking you to

6  decide it.

7        Is that something you would consider?  Is that

8  something that we should submit a letter brief on and set

9  another conference?

10        THE COURT:  Well, Mr. Zakarin?

11        MR. ZAKARIN:  If I can, your Honor, it seems to me

12  that our motion is primarily a jurisdictional motion which is

13  the first thing to be determined in any case anyway, whether

14  the Court should take subject matter jurisdiction over this

15  case which is the ripeness argument.  So, in terms of ordering

16  it, a summary judgment motion would seem to follow thereafter.

17  And if your Honor held that you have jurisdiction, I assume we

18  would be filing an answer to the complaint and if they wanted

19  to then move for summary judgment, I don't have a problem with

20  that, but I think doing it at this time is premature.

21        THE COURT:  Right.  I mean, I would have to determine

22  the jurisdictional issues as a threshold matter in the first

23  instance and I don't know whether we gain anything by having

24  you file those papers now.  So, why don't we hold off on that.

25        MR. JACOBS:  Thank you, your Honor.

H4J5mccC

1              THE COURT:  Very well.

2              So, Ms. Rivera, can we have the actual dates?

3              THE DEPUTY CLERK:  Yes.

4              The motion is due June 2, 2017; the opposition is due

5     June 30, 2017; and the reply is due July 14, 2017.

6              THE COURT:  Do we have all of those dates?

7              MR. ZAKARIN:  Yes.

8              THE COURT:  Anything else, Mr. Jacobs?

9              MR. JACOBS:  No.  Thank you very much for your time,

10    your Honor.

11             THE COURT:  Mr. Zakarin?

12             MR. ZAKARIN:  No, your Honor.  Thank you very much.

13             THE COURT:  In that event, we are adjourned.  Thank

14    you, gentlemen.  Very interesting.

15                                 o0o

16

17

18

19

20

21

22

23

24

25